1

**THE WAGNER FIRM**
Avi Wagner (#226688)

2

  *avi@thewagnerfirm.com*

3

1925 Century Park East, Suite 2100
Los Angeles, California 90067

4

Telephone:   (310) 491-7949

5

Facsimile:    (310) 491-7949
Email:  avi@thewagnerfirm.com

6

7

*Attorney for Plaintiff*

8

[Additional Counsel on Signature Page]

9

10

**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA**

11

JACLYN LIESMAN, derivatively on

12

behalf of MABVAX THERAPEUTICS
HOLDINGS, INC.,

13

14

                Plaintiff,

15

        v.

16

J. DAVID HANSEN, GREGORY P.

17

HANSON, PHILIP O. LIVINGSTON,
KENNETH M. COHEN, PAUL V.

18

MAIER, THOMAS C. VARVARO,
JEFFREY F. EISENBERG, PAUL F.

19

RESNICK, AND PAUL W. MAFFUID,

20

                Defendants,

21

        -and-

22

MABVAX THERAPEUTICS

23

HOLDINGS, INC.

24

                Nominal Defendant.

Case No.: **'18 CV 2237 BTM WVG**

**VERIFIED STOCKHOLDER
DERIVATIVE COMPLAINT**

**JURY TRIAL DEMANDED**

25

26

27

28

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Jaclyn Liesman ("Plaintiff"), by and through her attorneys, submits this Verified Stockholder Derivative Complaint against the Individual Defendants (defined herein) and alleges the following upon information and belief, except as to those allegations concerning Plaintiff, which are alleged upon personal knowledge. Plaintiff's information and belief is based upon her counsel's investigation, which includes, without limitation:  (a) review and analysis of regulatory filings made by nominal defendant MabVax Therapeutics Holdings, Inc. ("MabVax" or the "Company"), with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and media reports issued by and disseminated by MabVax; and (c) review of other publicly-available information concerning MabVax.

## NATURE OF THE ACTION

1.      This is a stockholder derivative action asserting claims for breach of fiduciary duty brought on behalf of nominal defendant MabVax against certain current and former officers of the Company and members of its Board of Directors (the "Board").  The claims arise out of the Individual Defendants' failure to implement and carry out necessary internal controls concerning the control of the Company and the beneficial ownership of its common and preferred stock; failure to make accurate public disclosures regarding those issues; and false statements to the Company's stockholders and the public concerning the Company's internal controls.

2.      MabVax is a clinical-stage biotechnical company focused on the rapid translation into clinical development of products to address unmet medical needs in the treatment of cancer.

3.      On January 30, 2018, the Company disclosed that it was the subject of an SEC investigation, pursuant to section 8(e) of the Securities Act of 1933 (the "Securities Act"), regarding certain of its prior registration statements and

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1

amendments thereto (the "SEC Investigation").[1]  On this news, MabVax's share price fell $0.48, or nearly 18%, representing a $3.23 million reduction in market capitalization.

4. Almost four months later, on May 20, 2018, MabVax's independent auditors withdrew their audit reports included in MabVax's Annual Reports on Form 10-K for the years 2014, 2015, 2016, and 2017.

5. The next day, on May 21, 2018, the Company revealed additional details about the SEC's investigation and the Individual Defendants' wrongful acts.[2] The Company disclosed that the SEC was investigating whether certain holders of MabVax preferred stock violated the reporting and disclosure requirements of Section 13(d) of the Exchange Act and Schedules 13D and 13G.  In particular, the May 2018 8-K revealed that certain preferred stockholders may have been acting as an undisclosed group, such that MabVax was obligated to have disclosed those stockholders' holdings as part of the Company's disclosures concerning the control of MabVax and beneficial ownership of its common and preferred stock.  MabVax disclosed that the SEC was investigating the circumstances under which those stockholders invested in the Company and the manner in which those stockholders may have sought to control or influence the Company.

6. The May 2018 8-K also disclosed that MabVax's failure to aggregate holdings of certain preferred stockholders that were acting as a group may have resulted in MabVax issuing shares of common stock in violation of its organizational documents.  As a result, the number of shares of outstanding common stock that MabVax previously reported in its financial statements, registration statements, and Exchange Act Reports was inaccurate.  Further, MabVax's reported financial

---

[1]  MabVax Current Report (Form 8-K), filed January 30, 2018 ("January 2018 8-K").

[2]  MabVax Current Report (Form 8-K), filed May 21, 2018 ("May 2018 8-K").

information contained in its financial statements, registration statements, and Exchange Act Reports was also inaccurate.

7.     The Individual Defendants knew, or were grossly reckless in not knowing, the identities of the preferred stockholders at issue and knew, or were grossly reckless in not knowing, that those stockholders were long-term business associates who often worked closely together with respect to investments, such as their investment in MabVax.  In addition, the Individual Defendants knew, or were grossly reckless in not knowing, of the preferred stockholders' improper joint efforts to exert influence and control over the Company.

8.     According to the May 2018 8-K, the Board began an internal review in light of the SEC Investigation.   The Board, upon the recommendation of management, advised MabVax stockholders and the public that they should not rely on the Company's prior annual and interim period financial statements for the years 2014, 2015, 2016 and 2017, or its registration statements filed during the years 2014, 2015, 2016, 2017, and to date for 2018 with respect to the number of shares of common stock outstanding, and the weighted average number of shares used in calculating earnings per share and related per share figures.

9.     The May 2018 8-K also disclosed that the Board appointed a Special Committee comprised of allegedly independent members of the Board to "supervise the Company's review of the matters believed to be under investigation."

10.    The May 2018 8-K announced that due to the SEC investigation and the Company's ongoing review of the facts and circumstances, the Company would not file a timely Quarterly Report on Form 10-Q for the quarter ended March 31, 2018. Finally, the May 2018 8-K reported that the Company notified the Listing Qualifications Department ("LQD") of the Nasdaq Stock Market that it would not file its Form 10-Q, as required for continued listing on the Nasdaq Capital Market.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

11.    Following the May 2018 8-K, MabVax stock fell another $0.41 per share, or over 23%, representing a further $3.67 million reduction in market capitalization.

12.    On August 1, 2018, MabVax announced that its four independent directors, defendants Kenneth M. Cohen, Paul V. Maier, Thomas C. Varvaro, and Jeffrey F. Eisenberg, had resigned as of July 31, 2018.  These directors comprised the Special Committee appointed to supervise the Company's investigations into the matters raised by the SEC.  On the same day, the Company announced that its Chief Financial Officer, defendant Gregory P. Hanson, was appointed to the Board.

13.    As a result of the Individual Defendants' failure to file timely reports with the SEC and MabVax's failure to maintain the $2.5 million minimum stockholders' equity requirement, MabVax's common stock was delisted by Nasdaq as of July 11, 2018.  MabVax's stock currently trades at approximately $0.56 per share – almost 80% below its trading price prior to the January 2018 8-K disclosures.

14.    The Company remains subject to the SEC investigation.  In addition, MabVax, its Chief Executive Officer ("CEO") and Chairman of the Board, J. David Hansen, and defendant Hanson are named defendants in two class actions alleging violations of the federal securities laws, pending in this district, captioned *Hardy v. MabVax Therapeutics Holdings*, Case No. 3:18-cv-1160-BAS-NLS (S.D. Ca.), and *Vinson v. MabVax Therapeutics Holdings*, Case No. 18-cv-1819-LAB-AGS (the "Securities Class Actions").

15.    The Individual Defendants breached their fiduciary duties of loyalty, candor, due care, and good faith by willfully engaging in the wrongdoing as alleged herein.  As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties, the Company has sustained damages including, but not limited to,

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT
4

the costs of investigating and defending the SEC Investigation and Securities Class Action.

## JURISDICTION AND VENUE

16.    The Court has jurisdiction over the claims in this action pursuant to 28 U.S.C. § 1332(a).  Plaintiff and all Defendants are citizens of different states and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

17.    The Court has personal jurisdiction over each of the Defendants because each Defendant is either a corporation conducting business and maintaining operations in this district, or is an individual who is either present in this district for jurisdictional purposes, or has sufficient minimum contacts with this district so as to render the exercise of jurisdiction by the Court permissible under traditional notions of fair play and substantial justice.

18.    Venue is proper in this district pursuant to 28 U.S.C. § 1391 because: (i) one or more of the Defendants either resides or maintains executive offices in this district; (ii) a substantial portion of the transactions and wrongs complained of herein occurred in this district; and (iii) Defendants have received substantial compensation and other transfers of money in this district by doing business and engaging in activities having an effect in this district.

## PARTIES

19.    Plaintiff is a stockholder of MabVax, was a stockholder of MabVax at the time of the wrongdoing alleged herein, and has been a stockholder of MabVax continuously since that time.  Plaintiff is a resident of Connecticut.

20.    Nominal defendant MabVax is a Delaware corporation with its principal executive offices located at 11535 Sorrento Valley Road, Suite 400, San Diego, California 92121.  Its stock trades on the US OTC exchange under the ticker "MBVX."

21.   Defendant Hansen co-founded MabVax in 2006 and has been MabVax's President, CEO, and Chairman of the Board since that time.  According to MabVax's Annual Report for the year ended December 31, 2017 ("2017 Form 10-K"), Hansen owns over 6.5% of MabVax's common stock.  Hansen received $989,257 and $2,165,915 in total compensation from MabVax in 2016 and 2017, respectively.  Hansen is named as a defendant in the Securities Class Actions.  Upon information and belief, Hansen is a citizen of California.

22.   Defendant Hanson has been MabVax's CFO since 2014 and a Board member since August 1, 2018.  According to the 2017 Form 10-K, Hanson owns over 2.5% of MabVax's common stock.  Hanson received $453,602 and $848,201 in total compensation in 2016 and 2017, respectively.  Hanson is a named defendant in the Securities Class Actions.  Upon information and belief, Hanson is a citizen of California.

23.   Defendant Philip O. Livingston has been MabVax's Chief Science Officer and a Board member since 2012.  Upon information and belief, Livingston is a citizen of New York.

24.   Defendant Cohen was a Board member from July 2014 through his resignation as of July 31, 2018.  He was Chairman of the Board's Compensation Committee and Nominating and Corporate Governance Committee, as well as a member of the Board's Audit Committee.  Upon information and belief, Cohen is a citizen of New York.

25.   Defendant Maier was a Board member from 2014 through his resignation on July 31, 2018.  He was the Chairman of the Board's Audit Committee and a member of the Nominating and Corporate Governance Committee.  Upon information and belief, Maier is a citizen of Virginia.

26.   Defendant Varvaro was a Board member from April 2015 through his resignation on July 31, 2018.  He was a member of the Board's Audit, Nominating

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

6

1 | and Corporate Governance, and Compensation Committees.  Upon information and

2 | belief, Varvaro is a citizen of Illinois.

3 | 27.   Defendant Eisenberg was a Board member from February 2016 through

4 | his resignation as of July 31, 2018.  He was a member of the Compensation and

5 | Nominating and Corporate Governance Committees.  Upon information and belief,

6 | Eisenberg is a citizen of Florida.

7 | 28.   Defendant Paul F. Resnick has been MabVax's Chief Business Officer

8 | and Vice President since April 2016.  Upon information and belief, Resnick is a

9 | citizen of California.

10 | 29.   Defendant Paul W. Maffuid has been MabVax's Executive Vice

11 | President of Research & Development since July 2014.  Upon information and

12 | belief, Maffuid is a citizen of California.

13 | 30.   Defendants Hansen, Hanson, Resnick, Maffuid, Livingston, Cohen,

14 | Maier, Varvaro, and Eisenberg are referred to herein as the "Individual Defendants."

15 | 31.   Defendants Hanson, Hansen, Livingston, Cohen, Maier, Varvaro, and

16 | Eisenberg are sometimes referred to herein as the "Director Defendants."

17 | **DUTIES OF THE INDIVIDUAL DEFENDANTS**

18 | 32.   By reason of their positions as officers and/or directors of the Company

19 | and because of their ability to control the business and corporate affairs of the

20 | Company, the Individual Defendants owe MabVax and its stockholders the fiduciary

21 | obligations of good faith, loyalty, and candor and are required to control and manage

22 | the Company in a fair, just, honest, and equitable manner.   The Individual

23 | Defendants are required to act in furtherance of the best interests of MabVax and its

24 | stockholders so as to benefit all stockholders equally and not in furtherance of their

25 | personal interest or benefit.  Each director and officer of the Company owes to

26 | MabVax and its stockholders the fiduciary duty to exercise good faith and diligence

27 |

28 | VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

1  in the administration of the affairs of the Company and in the use and preservation

2  of its property and assets, and the highest obligations of fair dealing.

3      33.   The Individual Defendants, because of their positions of control and

4  authority as directors and/or officers of the Company, directly and/or indirectly,

5  exercised control over the wrongful acts complained of herein.

6      34.   To discharge their duties, the officers and directors of the Company

7  were required to exercise reasonable and prudent supervision over the management,

8  policies, practices, and controls of the Company.   By virtue of such duties, the

9  officers and directors of the Company were required to, among other things:

10      a.   ensure that the Company complied with its legal obligations,

11  including acting only within the scope of its legal authority and disseminating

12  truthful and accurate statements to the SEC, other government agencies, and the

13  investing public and complying with all state and federal laws;

14      b.   conduct the affairs of the Company in a lawful, efficient,

15  business-like manner so as to provide the highest quality performance of its

16  business, to avoid wasting the Company's assets, and to maximize the value of

17  MabVax's stock;

18      c.   properly and accurately guide investors and analysts as to the true

19  financial condition of MabVax at any given time, including making accurate

20  statements about MabVax's financial results and prospects, and ensuring that the

21  Company maintained an adequate system of financial controls such that MabVax's

22  financial reporting would be true and accurate at all times;

23      d.   remain informed as to how the Company conducted its

24  operations, and, upon receipt of notice or information of imprudent or unsound

25  conditions or practices, make reasonable inquiry in connection therewith, and take

26  steps to correct such conditions or practices and make such disclosures as necessary

27  to comply with federal and state laws; and

28                    VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

e.    ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules, and regulations.

35.    The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith, and a reckless disregard for their duties to MabVax and its stockholders that the Individual Defendants knew would pose a risk of serious injury to the Company.

36.    On July 13, 2015, the Board adopted a Code of Conduct that governed the conduct of all subsidiaries, employees, consultants, and directors of MabVax (the "Code").  The Code sets forth "certain business practices and principles of behavior throughout [MabVax's] operations" and "is intended to serve as a guide to help [MabVax] maintain the highest ethical and professional standards. . . ."  The purpose of the Code is to promote, among other things:

- Compliance with applicable laws, rules and regulations;

- Honest and ethical conduct including, and the ethical handling of actual or potential conflicts of interest;

- The safeguarding of confidential information and the Company's assets;

- Complete, accurate and timely reporting of the Company's financial condition and results of operations including disclosures made in documents filed with, or furnished to, the SEC and in other public communications and complete and accurate recordkeeping;

- A healthy work environment that promotes work force diversity and is free of harassment and discrimination; and

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT
9

- • The prompt internal reporting and investigation of violations of this Code.

37.    The Code includes the following language:

**1.    Legal Compliance**

Obeying the law, both in letter and in spirit, is the foundation of this Code.  Our success depends upon each person's operating within legal guidelines and cooperating with local, national and international authorities.  We expect employees to understand the legal and regulatory requirements applicable to their area of responsibility.  If you do have a question in the area of legal compliance, it is important that you seek answers from your supervisor or the Compliance Officer (as described in the last section of this document, below).

Disregard of the law will not be tolerated. Violation of domestic or foreign laws, rules and regulations may subject you, as well as MabVax, to civil and/or criminal penalties.  Conduct and records, including emails, are subject to internal and external audits, and to discovery by third parties in the event of a government investigation or civil litigation.

**3.    Maintenance of Corporate Books, Records, Documents and Accounts**

Each employee must ensure that all MabVax documents are completed accurately, truthfully, in a timely manner, and, when applicable, are properly authorized.

Financial activities are to be recorded in compliance with all applicable laws and generally-accepted accounting practices.  To ensure that accurate financial and administrative information is maintained, you should not permit or take any action that would result in the inaccurate recording of entries in MabVax's books, records and ledgers.  We require that:

- • no entry be made in our books and records that intentionally hides or disguises the nature of any transaction or of any of our liabilities, or misclassifies any transactions as to accounts or accounting periods;

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

10

- transactions be supported by appropriate documentation;

- the terms of sales and other commercial transactions be reflected accurately in the documentation for those transactions and our books and records reflect such documentation and be accurate and complete;

- all employees comply with our system of internal controls; and

- no cash or other assets be maintained for any purpose in any unrecorded or "off-the-books" fund.

Our accounting records are also relied upon to produce reports for our management, stockholders and creditors, as well as for governmental agencies. In particular, we rely upon our accounting and other business and corporate records in preparing the periodic and current reports that we file with the SEC. These reports must provide full, fair, accurate, timely and understandable disclosure and fairly present our financial condition and results of operations in all material respects. All persons who collect, provide or analyze information for or otherwise contribute in any way in preparing or verifying these reports should strive to ensure that our financial disclosure is accurate and transparent and that our reports contain all of the information about MabVax that would be important to enable stockholders and potential investors to assess the soundness and risks of our business and finances and the quality and integrity of our accounting and disclosures. In addition:

- no employee may take or authorize any action that would cause our financial records or financial disclosure to fail to comply with generally accepted accounting principles, the rules and regulations of the SEC or other applicable laws, rules and regulations;

- all employees must cooperate fully with our Accounting Department, as well as our independent public accountants and counsel, respond to their questions with candor and provide them with complete and accurate information to help ensure that our books and records, as well as our statements and reports filed with the SEC, are accurate and complete; and

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

11

- no employee should knowingly make (or cause or encourage any other person to make) any false or misleading statement in any of our statements and reports filed with the SEC or knowingly omit (or cause or encourage any other person to omit) any information necessary to make the disclosure in any of our statements and reports accurate in all material respects.

Any person who becomes aware of any departure from these standards has a responsibility to report his or her knowledge promptly to a supervisor, the Compliance Officer or one of the other compliance resources described in the last section below.

We maintain a separate Document Retention Policy which you must be familiar with and follow.

## 4.   Honesty with Regulators and Other Government Officials

Because MabVax is subject to a variety of government regulations, particular care must be taken to ensure that no inaccurate or misleading reports, certifications, claims or statements are made to any government agency or official.

Any attempt, or activity that could be perceived as an attempt to improperly influence government officials and employees to obtain or reward favorable treatment must be avoided.  The U.S. Foreign Corrupt Practices Act (FCPA) is of particular importance in this area.   The FCPA generally forbids giving anything of value to foreign government officials or foreign political candidates in order to obtain or retain business.  It is therefore important to discuss these types of payments, including any gifts of the type discussed in the Gifts and Entertainment section below, in advance with your supervisor to make sure the Company's ethical standards are maintained and the law is followed.

## 11.   Media/Public Discussion

It is our policy to disclose to the public all material information concerning MabVax through channels such as press releases so that those who have an interest in MabVax and our securities will have equal access to the information. At the same time, we must be prudent in our dealings with the media. Unless you are a designated spokesperson or are otherwise authorized to speak on behalf of

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

12

MabVax, you should not communicate with the media or in other public forums about MabVax's business or operations.

**18.** **Compliance with the Code of Conduct; Standards and Procedures**

**To facilitate compliance with this Code, we have implemented a program of code awareness, training and review.   We have established the position of Compliance Officer to oversee our legal compliance and ethics program.   The Compliance Officer is a person to whom you can address questions or concerns, complaints or observations regarding suspected Code violations, _although, as discussed below, you should first discuss all such issues with your supervisor_, unless that is impossible or inappropriate under the circumstances.   The Compliance Officer, David Hansen, CEO, can be reached at extension 301 or by e-mail.   If it is impossible or inappropriate to discuss the matter with the Compliance Officer, you may contact our outside counsel, Jeremy Glaser of Mintz, Levin at 858.314.1515.   In addition to fielding questions, concerns, complaints or observations regarding suspected Code violations, the Compliance Officer is responsible for:**

- investigating possible violations of the Code;

- training new employees in Code policies and obtaining acknowledgments that each new employee has read and understands the Code;

- conducting training sessions and distributing to employees copies of the Code as appropriate with a reminder that they are responsible for reading, understanding and complying with the Code;

- obtaining annual acknowledgments from each employee that he or she has read and understands the Code;

- updating the Code as needed (and alerting employees to any such update), with appropriate approval of the Audit Committee, to reflect changes in the law, operations and in recognized best practices; and

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

13

- otherwise promoting an atmosphere of responsible and ethical conduct

**The Compliance Officer will investigate all reported possible Code violations promptly and confidentially as appropriate under the specific circumstances.**

**Your most immediate resource for any matter related to the Code is your supervisor. He or she may have the information you need or may be able to refer the question to another appropriate source. There may, however, be times when you prefer not to go to your supervisor.  In these instances, you should feel free to discuss your concern with the Compliance Officer.  If you are uncomfortable speaking with the Compliance Officer because he or she works in your department or is one of your supervisors, please contact our outside counsel as detailed above.  In addition, if your concern involves potential misconduct and relates to questionable accounting, internal controls or auditing matters, you may report directly to the Audit Committee as set forth below and in our separate policy "Policy for Complaints Related to Accounting and Audit Matters".**

***Accounting, Internal Controls and Auditing Matters***

**You should inform the Compliance Officer of any concerns, complaints or observations regarding questionable accounting, internal accounting controls or auditing matters (collectively "Accounting Matters") including any concerns or complaints regarding retaliation for reporting concerns, complaints or observations regarding Accounting Matters.  If you report any concerns, complaints or observations regarding Accounting Matters to the Compliance Officer, the Compliance Officer shall promptly inform the Audit Committee of our Board of Directors. You may also report any concerns, complaints or observations regarding Accounting Matters directly to the Audit Committee as detailed in our separate "Policy for Complaints Related to Accounting and Audit Matters." Reported concerns and complaints regarding Accounting Matters will be investigated promptly and confidentially as appropriate based on the specific circumstances.**

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT
14

*Clarifying Questions and Concerns; Reporting Possible Violations*

If you encounter a situation or are considering a course of action and its appropriateness is unclear, discuss the matter promptly with your supervisor or the Compliance Officer; even the appearance of impropriety can be very damaging and should be avoided.

If you are aware of a suspected or actual violation of Code standards by others, you have a responsibility to report it. Whether you choose to speak with your supervisor or the Compliance Officer, you should do so without fear of any form of retaliation.  We will take prompt disciplinary action against any person in the organization who retaliates against you. We have adopted a non-retaliation policy which prohibits any employee from being subject to disciplinary or retaliatory action by MabVax or any of our employees in connection with any good faith reports or complaints as discussed in such policy.

The complaint procedure is intended to ensure that employees have a mechanism that allows the employee to bypass a supervisor he or she believes is engaged in prohibited conduct.  You are expected to promptly provide to your supervisor or other persons to whom you make a compliance report, with a specific description of the violation that you believe has occurred, including any information you have about the persons involved and the time of the violation. Supervisors must promptly report any credible reports of Code violations to the Compliance Officer, as discussed above.  If you believe your supervisor has not taken appropriate action, you should contact the Compliance Officer, as discussed above, directly. You may also contact the Audit Committee directly, as discussed above.   Neither you nor your supervisor may conduct any preliminary investigation, unless authorized to do so by the Compliance Officer or member of the Audit Committee, as discussed above.

If a complaining employee wishes to disclose his or her identity, the employee may do so.  Confidentiality of the employee submitting the complaint will be maintained to the extent consistent with the law and the need to conduct an adequate investigation.  Your

**cooperation in the investigation will be expected.   Anonymous reports should be factual instead of speculative or conclusory, and should contain as much specific information as possible to allow the Compliance Officer and other persons investigating the report to adequately assess the nature, extent and urgency of the situation. Employees should realize that if an anonymous complaint cannot be properly investigated without additional information, we may have to close the matter for lack of sufficient information.**

**In the course of any investigation, we may find it necessary to share information with others on a "need to know" basis.  As needed, the Compliance Officer will consult with legal counsel, other members of management, the Human Resources department and/or the Audit Committee or the Board of Directors.**

**If the investigation indicates that a violation of the Code, including with respect to Accounting Matters, has probably occurred, we will take such action as we believe to be appropriate under the circumstances.  If we determine that an employee is responsible for a Code violation, he or she will be subject to disciplinary action up to, and including, termination of employment and, in appropriate cases, civil action or referral for criminal prosecution.  Appropriate action may also be taken to deter any future Code violations.**

38.     MabVax also maintains a Policy for Complaints Relating to Accounting and Audit Matters (the "Policy").  The Policy sets forth all MabVax employees, officers, and directors' "responsibility to guard against and report unethical or otherwise improper business practices and actions, including but not limited to, questionable accounting and auditing matters."  In order to facilitate the policy, the Board's Audit Committee – defendants Maier, Cohen, and Varvaro – established "procedures for the receipt, retention and handling of complaints regarding accounting and related practices, internal accounting controls or auditing matters. . . ."  According to the Policy, "[a]ny employee, agent, auditor, consultant, advisor, officer or director of the Company may submit a good faith Accounting

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

16

Complaint to the management of the Company or on an anonymous confidential basis, and without fear of dismissal or retaliation of any kind."

39.   The scope of the Policy includes:

**2.1   Fraud or deliberate error in the preparation, evaluation, review or audit of any financial statement of the Company.**

**2.2   Fraud or deliberate error in the recording and maintaining of financial records of the Company.**

**2.3   Deficiencies in or noncompliance with the Company's internal accounting controls.**

**2.4   Material misrepresentation or false statement to or by a senior officer or accountant regarding a matter contained in the financial records or audit reports, or an auditing, internal accounting controls or accounting matter contained in the financial reports of the Company.**

**2.5   Misrepresentation or omission of material facts in the reporting of the Company's financial condition.**

40.   Finally, the members of the Audit Committee – defendants Maier, Cohen, and Varvaro – must follow the terms of the Charter of the Audit Committee ("Audit Charter").   The primary purpose of the Audit Committee is to fulfill "the Board's oversight responsibilities with respect to the Company's corporate accounting and financial reporting processes, the systems of internal accounting and financial controls and audits of financial statements, the quality and integrity of the Company's financial statements and reports and the qualifications, independence and performance of the firm or firms of certified public accountants engaged as the Company's independent outside auditors for the purpose of preparing or issuing an audit report or performing other audit, review or attest services."

41.   The responsibilities set forth in the Audit Charter include:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

17

**5.** *Audited Financial Statement Review*. To review, upon completion of the audit, the financial statements proposed to be included in the Company's Annual Report on Form 10-K to be filed with the SEC and to recommend whether or not such financial statements should be so included.

**6.** *Annual Audit Results*. To discuss with management and the Auditors the results of the annual audit, including the Auditors' assessment of the quality, not just acceptability, of accounting principles, the reasonableness of significant judgments and estimates (including material changes in estimates), any material audit adjustments proposed by the Auditors and any adjustments proposed but not recorded, the adequacy of the disclosures in the financial statements and any other matters required to be communicated to the Committee by the Auditors under generally accepted auditing standards.

**7.** *Quarterly Results*. To review, discuss with management and the Auditors and approve the results of the Auditors' review of the Company's quarterly financial statements, prior to public disclosure of quarterly financial information, if practicable, or filing with the SEC of the Company's Quarterly Report on Form 10-Q, and any other matters required to be communicated to the Committee by the Auditors under generally accepted auditing standards.

**8.** *Management's Discussion and Analysis*. To review and discuss with management and the Auditors, as appropriate, the Company's disclosures contained under the caption "Management's Discussion and Analysis of Financial Condition and Results of Operations" in its periodic reports to be filed with the SEC.

**9.** *Press Releases*. To review, discuss with management and the Auditors, and approve as appropriate, earnings press releases, as well as the substance of financial information and earnings guidance provided to analysts and ratings agencies, which discussions may be general discussions of the type of information to be disclosed or the type of presentation to be made. The Chair of the Committee may represent the entire Committee for purposes of this discussion.

**16.** *Internal Control Over Financial Reporting*. To confer with management and the Auditors regarding the scope, adequacy and

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

effectiveness of internal control over financial reporting including any special audit steps taken in the event of material control deficiencies.

**17.** *Disclosure Controls*.   Review with management and the independent auditors the Company's disclosure controls and procedures, including any material issues regarding the efficacy of or deficiencies in the controls.

**19.** *Correspondence with Regulators*.  To consider and review with management, the Auditors, outside counsel, as appropriate, and, in the judgment of the Committee, such special counsel, separate accounting firm and other consultants and advisors as the Committee deems appropriate, any correspondence with regulators or governmental agencies and any published reports that raise material issues regarding the Company's financial statements or accounting policies.

**20.** *Complaint Procedures*.  To establish procedures, when and as required by applicable laws and rules, for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and the confidential and anonymous submission by employees of concerns regarding questionable accounting or auditing matters.

**21.** *Regulatory and Accounting Initiatives*.   To review with management, counsel and the Auditors, as appropriate, any significant regulatory or other legal or accounting initiatives or matters that may have a material impact on the Company's financial statements, compliance programs and policies if, in the judgment of the Committee, such review is necessary or appropriate.

**22.** *Ethical Compliance*.  To review the results of management's efforts to monitor compliance with the Company's programs and policies designed to ensure adherence to applicable laws and rules, as well as to its Code of Conduct, including review and approval of related-party transactions as required by the Nasdaq rules, review of updates to the Code of Conduct and review of policies regarding the hiring of former employees of the Auditors.

**23.** *Investigations*.  To investigate any matter brought to the attention of the Committee within the scope of its duties if, in the judgment of the Committee, such investigation is necessary or appropriate.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

19

**24.     *Proxy Report*.** To prepare the report required by the rules of the SEC to be included in the Company's annual proxy statement.

## SUBSTANTIVE ALLEGATIONS

## A.    BACKGROUND

42.     On June 30, 2014, MabVax issued a proxy statement on Schedule 14A which disclosed a proposed merger between MabVax and Telik, Inc.  When the merger closed, each share of MabVax common stock converted into and was exchanged for the right to receive a number of shares of Telik's common stock.

43.     The Individual Defendants are aware that since the Telik merger, MabVax has had a history of material weakness in its internal controls over financial reporting.

44.     On November 14, 2014, MabVax's quarterly report for the period ended September 30, 2014, disclosed that an evaluation of the efficacy of the Company's disclosure controls and procedures concluded that MabVax had, "material weakness in [its] internal controls over financial reporting" as of June 30, 2014, and continuing through September 30, 2014.  Defendants Hansen and Hanson concluded that the disclosure controls and procedures were not effective "to ensure that information required to be disclosed . . . is recorded, processed, summarized and reported within the time periods specified by the SEC rules and forms."

45.     On March 31, 2015, MabVax filed its annual report with the SEC on Form 10-K for the year ended December 31, 2014 ("2014 Form 10-K"), which repeated that "as of December 31, 2014, our internal controls over financial reporting were not effective due to material weakness noted above."  The 2014 Form 10-K stated:

> This annual report does not include an attestation report of the company's independent registered public accounting firm regarding internal control over financial reporting. Management's report was not

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

subject to attestation by the company's independent registered public accounting firm pursuant to rules of the Securities and Exchange Commission that permit the company to provide only management's report in this annual report.

46.   On May 15, 2015, MabVax filed its quarterly report for the quarter ended March 31, 2015.  Again, MabVax disclosed that "the Company's disclosure controls and procedures were not effective as of March 31, 2015, to ensure that information required to be disclosed by the Company . . . is recorded, processed, summarized and reported within the time periods specified by the SEC's rules and forms."

47.   The March 31, 2015, quarterly report also reported on MabVax's recent financing transaction:

> On March 31, 2015 and April 10, 2015, the Company closed on a financing transaction by entering into separate subscription agreements (the "Subscription Agreements") with accredited investors (the "Investors") relating to the issuance and sale of an aggregate of $11,714,501 of units (the "Units") at a purchase price of $0.75 per Unit, with each Unit consisting of one share of the Company's common stock, par value $0.01 per share (or, at the election of any Investor who, as a result of receiving common stock would hold in excess of 4.99% of the Company's issued and outstanding common stock, shares of the Company's newly designated 0% Series E Convertible Preferred Stock and a thirty month warrant to purchase one half of one share of common stock at an initial exercise price of $1.50 per share, as further described in the Notes to Financial Statements – Equity, (the "Private Placement").

48.   On August 10, 2015, MabVax filed its quarterly report for the period ending June 30, 2015, which again disclosed that the Company's disclosure controls were ineffective to ensure that MabVax would comply with the SEC's reporting requirements.   The quarterly report also provided disclosures concerning the Company's recent Common Stock Financing:

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

21

MabVax Common Stock Financing

On March 31, 2015, the Company entered into the Private Placement and sold $4,714,726 of Units, net of $281,023 in issuance costs, consisting of 6,661,000 shares of common stock and warrants to purchase 3,330,500 shares of common stock at $1.50 a share. The Units were sold at a price of $0.75 per Unit. On April 10, 2015, the Company completed the closing of the Private Placement and sold $3,831,622 of Units, net of $387,127 in issuance costs, of which $2,500,000 of the Units consisted of Series E preferred stock and the balance of investment consisting of 5,624,998 shares of common stock, together with warrants to all investors to purchase 4,479,167 shares of common stock at $1.50 a share. Each Unit was sold at a purchase price of $0.75 per Unit.

The Company paid commissions to broker-dealers in the aggregate amount of approximately $574,000 between March 25, 2015, and April 10, 2015, in connection with the Private Placement. OPKO Health, Inc. ("OPKO") was the lead investor in the Private Placement, purchasing $2,500,000 of Units consisting of Series E preferred stock. As a condition to the Series E preferred stock investment in the Private Placement, each of the other investors in the Private Placement agreed to execute the Lockup Agreement in favor of the Company, restricting the sale of 50% of the securities underlying the Units purchased by them for a period of 6 months and the remaining 50% prior to the expiration of 1 year following the final closing date of the Private Placement.

On June 30, 2015 the Company and the [OPKO] representative entered into a letter agreement pursuant to which the Company granted the representative the right, but not the obligation, until June 30, 2016, to nominate and appoint up to two additional members of the Company's board of directors (the "Board" or the "Board of Directors"), or to approve the person(s) nominated by the Company pursuant to the agreement in consideration for the release of the escrowed funds. The nominees will be subject to the satisfaction of standard corporate governance practices and any applicable national securities exchange requirements. Upon signing the agreement, the escrowed funds were released to the Company.

For purchasers who would hold 5% or more of the Company's common stock by entering into the Private Placement, they were entitled to elect instead of common stock, shares of the Company's Series E Convertible preferred stock, par value $0.01 per share (the "Series E preferred stock") convertible into an equivalent number of shares of such common stock.

The warrants are exercisable upon issuance and expire 30 months thereafter and may be exercised for cash or on a cashless basis. The warrants have a per share exercise price of $1.50, subject to certain adjustments typical of warrants, namely stock splits, dividends and reverse-splits. The Company is prohibited from effecting the exercise of the warrants to the extent that, as a result of such exercise, the holder beneficially would own more than 4.99% in the aggregate, of the issued and outstanding shares of the Company's common stock calculated immediately after giving effect to the issuance of shares of common stock upon the exercise of the warrants.

49.    On October 30, 2015, MabVax filed its quarterly report for the period ended September 30, 2015.  The September 30, 2015, report again disclosed that the Company's disclosure controls and procedures were not effective as of September 30, 2015.

50.    With respect to the Company's Common Stock Financing, the September 30, 2015, report disclosed:

On April 10, 2015, the Company consummated the second and final closing of the April 2015 Private Placement and sold $3,831,622 of Units, net of $387,127 in issuance costs, of which $2,500,000 of the Units consisted of Series E preferred stock and the balance of consisting of 5,624,998 shares of common stock, together with warrants to all investors to purchase 4,479,167 shares of common stock at $1.50 a share. Each Unit was sold at a purchase price of $0.75 per Unit.

The Company paid commissions to broker-dealers in the aggregate amount of approximately $574,000 in the April 2015 Private Placement. OPKO was the lead investor in the April 2015 Private Placement, purchasing $2,500,000 of Units consisting of Series E preferred stock. As a condition to OPKO's participation in the April

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

23

2015 Private Placement, each of the other investors in the April 2015 Private Placement agreed to execute lockup agreements restricting the sale of 50% of the securities underlying the Units purchased by them for a period of 6 months and the remaining 50% prior to the expiration of 1 year following the final closing date of the April 2015 Private Placement.

The warrants are exercisable upon issuance and expire 30 months thereafter and may be exercised for cash or on a cashless basis. The warrants have a per share exercise price of $1.50, subject to certain adjustments typical of warrants, namely stock splits, dividends and reverse-splits. The Company is prohibited from effecting the exercise of the warrants to the extent that, as a result of such exercise, the holder beneficially would own more than 4.99% in the aggregate, of the issued and outstanding shares of the Company's common stock calculated immediately after giving effect to the issuance of shares of common stock upon the exercise of the warrants.

Between April 13, 2015, and April 14, 2015, certain holders of warrants issued in the April 2015 Private Placement to purchase an aggregate of 1,849,999 shares of common stock exercised such warrants on a cashless basis for an aggregate issuance of 1,219,780 shares of common stock. As of September 30, 2015, there were 5,959,668 warrants outstanding to purchase common stock at $1.50 a share.

51.    On March 14, 2016, MabVax filed its annual report for the period ended December 31, 2015 (the "2015 Form 10-K"). The 2015 Form 10-K asserted, for the first time in more than a year, that Defendants Hansen and Hanson concluded that the Company's internal control over financial reporting was effective.

52.    On March 1, 2017, MabVax filed its annual report for the period ended December 31, 2015 (the "2016 Form 10-K"). The 2016 Form 10-K made disclosures concerning certain financing transactions:

August Public Offering –On August 22, 2016, we closed a public offering of 1,297,038 shares of common stock and 665,281 shares of Series F Convertible Preferred Stock ("Series F Preferred Stock"), and warrants to purchase 1,962,319 shares of common stock at $5.55 per

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

24

share and warrants to purchase 1,962,319 shares of common stock at $6.29 per share, at an offering price of $4.81 per share. For every one share of common stock or Series F Preferred Stock sold, we issued one warrant to purchase one share of common stock at $5.55 per share and one warrant to purchase one share of common stock, warrant to purchase one share of common stock at $5.55 per share and one warrant to purchase one share of common stock at $6.29 per share. We received $9,438,753 in gross proceeds, before underwriting discounts and commissions and offering expenses totaling $871,305.

Oxford Loan –On January 15, 2016, we entered into a loan and security agreement with Oxford Finance LLC (the "Load and Security Agreement") providing for senior secured term loans to us in the aggregate principal amount of up to $10,000,000. On January 15, 2016, we received an initial loan of $5,000,000 under the Loan and Security Agreement. The option to draw the second $5,000,000 expired on September 30, 2016.

Underwritten Offering –On September 30, 2015, we entered into an underwriting agreement with Laidlaw & Company (UK) Ltd. relating to the issuance and sale in a public offering of 337,838 shares of our common stock and 168,919 three-year warrants to purchase 168,919 shares of our common stock at an initial exercise price of $9.77 per share (all numbers adjusted for the Listing Reverse Split). The shares of common stock were sold at a public offering price of $8.14 per share and the warrants were sold at a price of $0.01 per warrant (adjusted for the Listing Reverse Split). The offering closed on October 5, 2015 with total gross proceeds to us of $2,750,000.

**B.    MABVAX'S RELATED PREFERRED STOCKHOLDERS**

53.    As a result of the various preferred stock issuances set forth above, the Individual Defendants knew that certain investors held significant stakes in MabVax.  At times, the individual stakes exceeded 5% of MabVax's outstanding common shares.  These investors, including OPKO, Dr. Phillip Frost ("Frost"), Michael Brauser ("Brauser"), Barry Honig ("Honig"), and John Stetson ("Stetson"),

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

25

are close business associates, having invested hundreds of millions of dollars together in numerous enterprises.[3]

54.    OPKO is controlled by its Chairman and CEO, billionaire investor Dr. Philip Frost.[4]   Frost also co-owns Frost Gamma Investments Trust ("FGIT"), a private investment vehicle.

55.    FGIT filed a Schedule 13G/A with the SEC on December 31, 2015 disclosing that Frost and FGIT had shared voting power over approximately 1.4 million MabVax shares held by FGIT, representing 4.99% of MabVax's outstanding common stock.  FGIT Filed a Schedule 13G/A on December 31, 2016 disclosing that Frost and FGIT had shared voting power over shares representing 6.71% of MabVax's outstanding common stock.  FGIT Filed a Schedule 13G/A on December 31, 2017 disclosing that Frost and FGIT had shared voting power over shares representing 4.99% of MabVax's outstanding common stock.

56.    Brauser filed a Schedule 13G on January 24, 2017 disclosing that he had shared voting power over shares representing 5.44% of MabVax's outstanding common stock.

57.    Honig filed a Schedule 13G on December 31, 2016 disclosing that he had sole or shared voting power over shares representing 6.22% of MabVax's outstanding common stock.  Honig filed a Schedule 13D on February 12, 2018 disclosing that he had shared voting power over shares representing 4.99% of

---

[3]   OPKO, Dr. Phillip Frost, Michael Brauser, Barry Honig, John Stetson, and Frost Gamma Investments Trust are all named defendants in a complaint filed by the SEC in the Southern District of New York, captioned *SEC v. Barry Honig, et al.*, 18-cv-8175 (S.D.N.Y filed Sept. 7, 2018).

[4]   Dr. Frost and his company, OPKO, are currently under investigation by the SEC and are also named defendants in four securities fraud class action lawsuits pending in the Southern District of New York, the District of New Jersey, and the Southern District of Florida.  The securities actions allege, *inter alia*, that Frost and others were participants in a "pump and dump" scheme that allowed Frost and his business associates to reap millions of dollars in unlawful profits.

MabVax's outstanding common stock.  Honig filed a Schedule 13G on August 6, 2018 disclosing that he had shared voting power over shares representing 4.99% of MabVax's outstanding common stock.

58.    Stetson filed a Schedule 13G on September 11, 2018 disclosing that he and HS Contrarian Investments, Inc., held shared voting power over shares representing 5.64% of MabVax's outstanding common stock.  Stetson filed a Schedule 13G on February 12, 2018 disclosing that he and HS Contrarian Investments, Inc., held shared voting power over shares representing 4.99% of MabVax's outstanding common stock.  Stetson filed a Schedule 13D on July 24, 2018 disclosing that he and HS Contrarian Investments, Inc., held shared voting power over shares representing 4.99% of MabVax's outstanding common stock.

59.    The Individual Defendants knew, or were grossly reckless in not knowing, that Frost, Brauser, Honig and Stetson were close business associates who had jointly participated in hundreds of millions of dollars of investments.  A lawsuit pending in the United States District Court for the District of Minnesota alleges that Frost, OPKO, Brauser, Honig and others engaged in a "pump and dump" scheme related to the company, BioZone Pharmaceuticals, Inc. (now known as CoCrystal Pharma, Inc.).[5]

## C.    THE SEC INVESTIGATION

60.    After MabVax initially disclosed the SEC investigation in its January 2018 8-K, the Company released statements regarding the unreliability of its financial statements and concluded that the Company would be unable to file its Form 10-Q for the quarter ended March 31, 2018.

61.    On April 2, 2018, MabVax filed its annual report with the SEC on Form 10-K for the year ended December 31, 2017 (the "2017 10-K"), which asserted that

---

[5] *Pederson v. Frost, et al.*, Case 17-cv-05580-WMW-BRT (D. Minn.).

MabVax's internal controls were effective.  The 2017 10-K stated, in relevant part: "We conducted an evaluation of the effectiveness of internal control over financial reporting. . . .  Based on this evaluation, our principal executive officer and principal financial officer conclude that, at December 31, 2017, our internal controls over financial reporting were effective."

62.     However, according to the May 2018 8-K, MabVax's internal controls over financial reporting were not effective.  MabVax disclosed that its annual and interim period financial statements for the years 2014, 2015, 2016, and 2017, and its registration statements filed during the years 2014, 2015, 2016, 2017, and 2018, should not be relied upon.  As noted above, MabVax's auditors withdrew their audit reports with respect to the years 2014, 2015, 2016, and 2017.  MabVax cautioned investors not to rely upon these financial statements or MabVax's prior disclosures regarding the beneficial ownership of its capital stock included in its various registration statements, Exchange Act reports, and other SEC filings on or after January 1, 2014.

63.     Additionally, the 2017 10-K disclosed information on stockholders, including those individuals "known by [the Company] to beneficially own more than 5% of [the Company's] common stock."  Based on Schedule 13G reports filed by Brauser, Frost, Honig, and Stetson, there were individuals who owned greater than 5% of the Company's common stock.  Brauser beneficially owned 342,614 shares representing 5.44% of the Company's stock at the time of his Schedule 13G filing on February 2, 2017.  Frost beneficially owned 422,334 shares representing 6.71% of the Company's stock at the time of his Schedule 13G filing on February 3, 2017.  Honig beneficially owned 391,648 shares representing 6.22% of the Company's stock at the time of his Schedule 13G filing on February 17, 2017.  Stetson beneficially owned 854,682 shares representing 5.64% of the Company's common stock at the time of his Schedule 13G filing on September 19, 2017.  The 2017 10-K,

however, states that there are no beneficial owners of 5% of the Company's common stock.

### DAMAGES TO MABVAX

64.   As a result of the Individual Defendants' wrongful conduct, the Company maintained weak and deficient internal controls over financial reporting, incorrectly calculated and reported beneficial ownership, permitted improper influence and control over the Company and themselves, and made a series of false and misleading statements about the same.   All of these actions have devastated MabVax's credibility.   The Company has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

65.   The Individual Defendants' actions as alleged herein, have subjected MabVax to the Securities Class Actions and the SEC Investigation.   Legal and settlement fees from these lawsuits and investigations will likely cost the Company tens of millions of dollars.

66.   Moreover, these actions have irreparably damaged MabVax's corporate image and goodwill.   For the foreseeable future, MabVax will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that MabVax's ability to raise equity capital or debt on favorable terms in the future is now impaired.   The Company will also have a "black-eye" similar to that of other companies investigated by the SEC that could damage their standing in the American business community indefinitely.

### PLAINTIFF'S DEMAND AND DERIVATIVE ALLEGATIONS

67.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

68.   Plaintiff brings this action derivatively in the right and for the benefit of MabVax to redress the Individual Defendants' breaches of fiduciary duties.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

69.     Plaintiff currently owns MabVax common stock and has been an owner of MabVax common stock at all times relevant hereto.

70.     Plaintiff will adequately and fairly represent the interests of MabVax and its stockholders in enforcing and prosecuting its rights.

71.     As a result of the facts set forth herein, Plaintiff has not made any demand on the MabVax Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

72.     At the time this action was commenced, the Board consisted of three directors:  defendants Hansen, Hanson, and Livingston (the "Current Directors"). All three members of the Board are MabVax insiders and are therefore incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

73.     The Current Directors face a substantial likelihood of liability for their individual misconduct.  The Current Directors were directors or senior officers at all relevant times, and as such had a fiduciary duty to protect the Company's assets and ensure that the Company complied with all laws and regulations.

74.     Moreover, the Current Directors had a duty to act in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and/or were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, the Current Directors knowingly and/or with reckless disregard, reviewed, authorized, and/or caused the actions described herein to occur, thereby damaging the Company and its stockholders.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

30

75.    If the Company's officers and directors are protected against personal liability for their breaches of fiduciary duty by Directors & Officers Liability Insurance ("D&O Insurance"), they will have effectively caused the Company to purchase insurance for their personal protection with corporate funds, *i.e.*, monies belonging to the stockholders.  However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by MabVax against the Individual Defendants, known as the "insured versus insured exclusion."

76.    As a result, were the Current Directors to sue themselves or officers of the Company, they would not be covered by D&O Insurance and are therefore unlikely to bring a suit.  On the other hand, if the suit is brought derivatively, as is this action, such insurance coverage exists and will provide a basis for the Company to effectuate recovery.  Therefore, the Current Directors cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

77.    Based on the factual circumstances described herein, the Current Directors are more interested in protecting themselves than they are in protecting the Company by prosecuting this action.  Therefore, demand on MabVax and its Board is futile and is excused.  The Company has been, and will continue to be, exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Current Directors have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Current Directors are breaching their fiduciary duties to MabVax and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

**COUNT I**

**AGAINST THE INDIVIDUAL DEFENDANTS
FOR BREACH OF FIDUCIARY DUTY**

78.     Plaintiff incorporates by reference all preceding and subsequent paragraphs as if fully set forth herein.

79.     The Individual Defendants each owed MabVax and its stockholders the fiduciary duties of loyalty, good faith, candor, and due care in managing and administering the Company's affairs.

80.     The Individual Defendants were required to exercise reasonable and prudent supervision over the management, practices, controls, and financial and regulatory affairs of MabVax.

81.     The Individual Defendants breached their fiduciary duties to MabVax and its stockholders by willfully, recklessly, and/or intentionally causing the Company to waste valuable assets and unnecessarily expend corporate funds, and failing to properly oversee the Company's business, rendering them personally liable to the Company.

82.     Each of the Individual Defendants had actual or constructive knowledge that inadequate internal controls concerning its reporting of its common stock ownership and beneficial ownership.  The Individual Defendants also had actual or constructive knowledge of certain preferred stockholders' improper joint efforts to influence and control the Company.  The Individual Defendants breached their fiduciary duties by failing to implement and necessary controls to ensure that their financial disclosures and disclosures concerning stock ownership and beneficial ownership were accurate and truthful.  The Individual Defendants further knowingly causing and/or recklessly allowing the Company to make false and misleading statements regarding its stock ownership and beneficial ownership as alleged herein.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT
32

83. The Individual Defendants further breached their fiduciary duties by allowing MabVax to report false and misleading financial results that incorporated false information concerning the number of common shares outstanding.

84. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary duties of loyalty, good faith, candor, and due care, as alleged herein, MabVax has sustained, and continues to sustain, significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A. Declaring that Plaintiff may maintain this derivative action on behalf of MabVax and that Plaintiff is a proper and adequate representative of the Company;

B. Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties;

C. Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties, including, but not limited to the institution of appropriate corporate governance measures;

D. Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

E. Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

33

1

2   Dated:  September 26, 2018          THE WAGNER FIRM

3

4                                       By:  *s/ Avi Wagner*
                                        Avi Wagner (#226688)
5                                          *avi@thewagnerfirm.com*
                                        1925 Century Park East, Suite 2100
6                                       Los Angeles, California 90067
                                        Telephone:   (310) 491-7949
7                                       Facsimile:    (310) 491-7949

8

9                                       BRAGAR EAGEL & SQUIRE, P.C.
                                        David J. Stone (#208961)
10                                         *stone@bespc.com*
                                        Melissa A. Fortunato (#319767)
11                                         *fortunato@bespc.com*
                                        885 Third Avenue, Suite 3040
12                                      New York, New York 10022
                                        Telephone:   (212) 308-5858
13                                      Facsimile:    (212) 486-0462

14

15                                      *Counsel for Plaintiff*

16

17

18

19

20

21

22

23

24

25

26

27

28
                   VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

**VERIFICATION**

I, Jaclyn Liesman hereby verify that I have authorized the filing of the attached Verified Stockholder Derivative Complaint; that I have reviewed the Verified Stockholder Derivative Complaint; and that the facts therein are true and correct to the best of my knowledge, information, and belief. I declare under penalty of perjury that the foregoing is true and correct.

DATED: September ___, 2018

Sep 24, 2018
_____
Jaclyn Liesman

Signature: *Jaclyn Liesman*
Jaclyn Liesman (Sep 24, 2018)

Email: jackie.liesman@gmail.com